```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                                            :
ELIJAH SANFORD,                                             :
                                                            :
                            Plaintiff,                      :    MEMORANDUM
                                                            :    DECISION AND ORDER
               - against -                                  :
                                                            :    17-cv-5132 (BMC)
                                                            :
LESLIE BRUNO, BKLYN HOUSE DIR S.                            :
GRANDISON, INVESTIGATOR D. ALLEN,                           :
CDC HEARING OFFICER DANIEL GARCIA,                          :
and DHO OFFICER PATRICK MCFARLAND,                          :
                                                            :
                            Defendants.                     :
----------------------------------------------------------- X
```

**COGAN**, District Judge.

This is a *pro se* action by a former federal prisoner who claims that he was wrongfully held in a custodial facility instead of a halfway house for 161 days. There is no cognizable federal claim; accordingly, defendants' Rule 12 motions are granted.

## SUMMARY OF COMPLAINT

In March 2007, plaintiff was convicted of violating 18 U.S.C. § 1951(a) and sentenced to 148 months in federal custody. On September 28, 2016, as the end of his term approached, the Bureau of Prisons reassigned him to a halfway house in Brooklyn known as Brooklyn House. Brooklyn House is owned and operated by a private contractor known as CORE Services Group, Inc. Defendant Leslie Bruno is the Director of Brooklyn House; defendant Steven Grandison is an investigator employed by CORE at Brooklyn House.

On either March 24 or March 29, 2017, plaintiff obtained a pass allowing him to visit his family home, with a date to return to Brooklyn House no later than April 6, 2017 at 1:30 p.m. But on April 5, the Nassau County Police Department arrested plaintiff for criminal trespass

(apparently arising out of a domestic dispute involving plaintiff's daughter) and he was taken to a police precinct. Plaintiff maintains that his arrest was "deemed unlawful in a disposition."

At plaintiff's request, the police notified Brooklyn House of his arrest. When Bruno learned of the arrest, she contacted defendant Patrick McFarland, a Residential Reentry Manager for the Bureau of Prisons, and he obtained a federal detainer against plaintiff. Pursuant to the detainer, plaintiff was delivered from state to federal custody, and transported to the Metropolitan Detention Center ("MDC"). Thus, as a result of his trespassing arrest, plaintiff was unable to check back in to the Brooklyn House on April 6. The complaint is not clear if he was in state or federal custody on April 6, but in either case, he could not return to Brooklyn House.

Defendant Grandison, in his capacity as a CORE investigator, visited plaintiff at the MDC on April 12. He took plaintiff's statement, and delivered to him an already-completed incident report, charging plaintiff with "escape – technical." The incident report, which Bruno had prepared, misstated the mandated reporting date for plaintiff's return to Brooklyn House as April 5 instead of April 6.

On April 18, 2017, the Center Discipline Committee, chaired by defendant David Allen, held a hearing. It emerged at the hearing that the incident report misstated plaintiff's return reporting date (April 5 instead of April 6). The Committee did not render a decision. Instead, on May 2, Grandison and Allen visited plaintiff at the MDC and presented him with an amended incident report. The amended report corrected plaintiff's reporting date from April 5 to April 6, and gave more specifics about the terms of his release pass. After plaintiff received the amended incident report, the Committee held another hearing on June 6, 2017.

On June 8, 2017, the Committee, in a report reviewed and certified by defendant Daniel Garcia, a Disciplinary Hearing Officer, sustained the charge of "Escape (Technical)" as a result

of plaintiff's failure to report back to Brooklyn House. The Committee's report essentially found that plaintiff knew that the Brooklyn House rules required him to timely return from his pass; that he had failed to do so; and that he was therefore in an "escape" status. The findings did not note that plaintiff had asked the police to notify Brooklyn House of his arrest; that plaintiff contended the arrest was illegal; or that plaintiff had failed to return not just because of his arrest, but because of the federal detainer of which McFarland had notified the police. The Committee recommended a sanction of "transfer[] to a more secure facility."

Plaintiff appealed the recommendation of the Committee. His primary assertion, among a number of others, was that he had spoken to defendant Allen after the first hearing, and that he (Allen) told plaintiff that he had wanted to dismiss the charge after the first hearing and that someone had already decided to sustain the charge without his input. In other words, plaintiff alleged that his guilt had been predetermined at both hearings and, indeed, Bruno or other defendants had already drafted the Committee's report to sustain the charge before the hearings occurred.

On August 4, 2017, a BOP Regional Director sustained plaintiff's appeal and rejected the recommendation of the Committee on the ground that "a thorough review of the record reveals questions concerning the disciplinary process. Based on this review, it was determined this action and the sanctions imposed will be expunged from your disciplinary record."[1]

Notwithstanding this ruling, plaintiff was not returned to Brooklyn House or any other halfway house. He remained at the MDC.

---

[1] Plaintiff alleges that "the [Regional] Director agreed there were constitutional violations." He did not. He only said there were "questions concerning the disciplinary process." The Regional Director had discretion to simply vacate the charges rather than determining the merits of issues that arose during the disciplinary proceedings.

Plaintiff, as petitioner, then commenced a proceeding for *habeas corpus* relief under 28 U.S.C. § 2241 before this Court on August 21, 2017. He failed to pay the required filing fee or complete the *in forma pauperis* application even after notice, and this Court therefore dismissed the *habeas corpus* proceeding on September 26, 2017. Sanford v. Quay, No. 17-cv-5029 (E.D.N.Y. Sept. 25, 2017).

It may be that plaintiff did not pursue *habeas corpus* relief because four days after he commenced that proceeding, on August 25, 2017, he commenced the instant case seeking damages. In addition, the public record reflects that he was released from custody on September 29, 2017,[2] which may have mooted his § 2241 proceeding had it not already been dismissed three days earlier.

In total, plaintiff claims that he served at least 161 days in the MDC that should have been served at Brooklyn House or another halfway house, and the damages he seeks are to redress the emotional injury and physical deprivations he suffered while at the MDC instead of the halfway house.

## DISCUSSION

Plaintiff has two theories as to how his rights were violated. The first has a procedural and a substantive component. The procedural component is that numerous constitutional and BOP rules violations attended the hearings, and he was denied procedural due process by the failure to adhere to those rules. As part of this, plaintiff contends that his guilt was predetermined and the hearings were a sham. The substantive component is that he was in fact innocent of the charges because his arrest by the Nassau County Police was illegal, and Allen

---

[2] Federal Bureau of Prisons, Find an inmate, https://www.bop.gov/inmateloc/ (last visited May 11, 2018).

4

and Grandison never should have caused McFarland to file a federal detainer against him. It was the detainer, plaintiff contends, that caused his failure to timely return to Brooklyn House.

Plaintiff's second theory is that his rights were violated by not returning him to a halfway house instead of keeping him at the MDC, at least once his appeal was sustained, and perhaps from the day of his transfer to the MDC.

The federal defendants (Garcia and McFarland) and the CORE defendants (Allen and Grandison) have separately moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) and 12(c), respectively.[3] The standard of review under both subparts of Rule 12 is the same. See Bank of N.Y. v. First Millennium, Inc., 607 F.3d 905, 922 (2d Cir. 2010). In considering a motion to dismiss pursuant to Rule 12(b)(6) or 12(c), a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. See Rothstein v. UBS AG, 708 F.3d 82, 90 (2d Cir. 2013). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," however, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

"[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976)). A court must read a *pro se* party's pleadings liberally, interpreting them to raise the strongest arguments they suggest. Keeling v. Hars, 809 F.3d 43, 47 n.2 (2d Cir. 2015). If a liberal reading of the complaint "gives any indication that a valid claim might be stated," the court must grant leave to amend the complaint.

---

[3] Leslie Bruno has not appeared in this action, although the docket reflects that she was served.

See Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000) (quoting Gomez v. USAA Fed. Sav. Bank, 171 F.3d 794, 795 (2d Cir. 1999)).

## I. Federal Defendants

The most reasonable reading of plaintiff's claim against the federal defendants is they violated his right to due process of law when they failed to return him to the halfway house once he prevailed on appeal. Even if I assume for the sake of argument that plaintiff is correct, the question remains whether the law provides a remedy for this violation of his rights. For a plaintiff to enforce his constitutional rights he must have a cause of action – that is, there must be a statute passed by Congress or a judicially implied claim for relief. Here, plaintiff cannot point to any statute that would allow him to prosecute this action. The only question is whether there is a judicially implied claim for relief.

In Bivens v. Six Unknown Narcotics Agents, 403 U.S. 388 (1971), the Supreme Court recognized "an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." McGowan v. United States, 825 F.3d 118, 123 (2d Cir. 2016) (quoting Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 66 (2001)). The Bivens Court implied a private right of action under the Fourth Amendment for an unreasonable search and seizure claim against FBI agents for handcuffing a man in his own home without a warrant. Bivens, 403 U.S. at 389, 397. Since then, the Supreme Court has recognized Bivens claims in only two other circumstances: (1) under the Fifth Amendment's Due Process Clause for gender discrimination against a Congressman for firing his female secretary, Davis v. Passman, 442 U.S. 228 (1979), and (2) under the Eighth Amendment's prohibition on cruel and unusual punishment against prison officials for failure to treat an inmate's asthma which led to his death, Carlson v. Green, 446 U.S. 14 (1980).

Although Carlson and Davis were handed down within a decade of Bivens, they mark the beginning of a still-unbroken period of nearly 40 years since the Supreme Court has authorized a Bivens damages action covering the exercise of any other constitutional right. This supports the majority's observation in Malesko that, since Bivens, "we have retreated from our previous willingness to imply a cause of action where Congress has not provided one." 534 U.S. at 67 n.3. It also supports the even stronger observation of two concurring Justices that

> Bivens is a relic of the heady days in which this Court assumed common-law powers to create causes of action – decreeing them to be 'implied' by the mere existence of a statutory or constitutional prohibition. . . . [W]e have abandoned that power to invent "implications" in the statutory field. There is even greater reason to abandon it in the constitutional field, since an "implication" imagined in the Constitution can presumably not even be repudiated by Congress.

Malesko, 534 U.S. at 75 (Scalia, J., concurring) (internal citations omitted).

Notwithstanding the Supreme Court's retreat, lower courts have relied on Bivens as a blueprint for implying causes of action. Although acknowledging that the judicial damage remedy in Bivens itself is "extraordinary" and should rarely be applied in "new contexts," Arar v. Ashcroft, 585 F.3d 559, 571 (2d Cir. 2009) (en banc) (quoting Malesko, 534 U.S. at 69), lower courts have recognized implied rights of action premised on constitutional rights other than the three identified by the Supreme Court.

Recently, however, the Supreme Court has re-emphasized that courts should not imply rights and remedies as a matter of course, "no matter how desirable that might be as a policy matter, or how compatible with the statute [or constitutional provision]." Ziglar v. Abbasi, 137 S. Ct. 1843, 1856 (2017) (quoting Alexander v. Sandoval, 532 U.S. 275, 286-87 (2001)). "Given the notable change in the [Supreme] Court's approach to recognizing implied causes of action . . . the Court has made clear that expanding the Bivens remedy is now a 'disfavored' judicial activity." Id. at 1857 (quoting Iqbal, 556 U.S. at 675).

7

Ziglar also made it clear that the *only* recognized implied rights of action are the narrow situations presented in Bivens, Davis, and Carlson. Practically speaking, this means that, post-Ziglar, even where a Court of Appeals had previously found a Bivens remedy, that court or a district court must reconsider whether one is available.[4] See 137 S. Ct. at 1865 (vacating the Second Circuit's holding in Turkmen v. Hasty, 789 F.3d 218 (2015) (panel decision), and Turkmen v. Hasty, 808 F.3d 197 (2015) (en banc), because the court failed to conduct the appropriate Bivens analysis); see also Vanderklok v. United States, 868 F.3d 189, 199-200 (3d Cir. 2017) (holding that, even though the Third Circuit had previously found a Bivens remedy in a First Amendment retaliation context, that precedent no longer holds in light of Ziglar and the court "must look at the issue anew in this particular context, . . . and as it pertains to this particular category of defendants").

Thus, this Court must also look "anew" whether particular facts in this case give rise to a Bivens remedy.[5] In doing so, this Court is guided by additional principles articulated by the Supreme Court. Even though the Supreme Court has recognized causes of action in Bivens under the Fourth Amendment, in Davis under the Fifth Amendment, and in Carlson under the Eighth Amendment, those cases do not guarantee that any cause of action may lie under those amendments. In fact, the Supreme Court has refused to extend Bivens to contexts beyond the

---

[4] Ziglar's treatment of Bivens can be analogized to *habeas corpus* relief under 28 U.S.C. § 2254(d). In the latter, by statute, a prisoner must show the state court's determination of a constitutional issue was contrary to or an unreasonable application of Supreme Court – not circuit court or district court – authority. That standard requires at least some similarity between the Supreme Court authority and the *habeas* case in which it is being invoked. Ziglar similarly suggests that if a Bivens action cannot reasonably be implied as analogous to the facts of Bivens itself, Davis, or Carlson, then it is inappropriate for a lower court to authorize that claim, even if pre-Ziglar circuit authority would have.

[5] The Second Circuit had previously assumed, without conducting a special factors analysis, that a Bivens remedy was available for an unreasonable refusal to release an inmate from a special housing unit to the general population. See Gonzalez v. Hasty, 802 F.3d 212 (2d Cir. 2015). In that the case, the Second Circuit said a remedy "may" exist, but did not decide the issue. The Circuit's holding that a remedy "may" exist, together with the Supreme Court's mandate in Ziglar, supports this Court's decision to consider the particular facts of the case and determine whether a Bivens remedy is available.

specific clauses of the specific amendments for which a cause of action had been implied, or even to other classes of defendants facing liability under those same clauses. Compare Davis, 442 U.S. at 243-44 (permitting Bivens action against a Congressman for violation of an employee's Fifth Amendment due process rights) with Schweiker v. Chilicky, 487 U.S. 412, 428-29 (1988) (refusing to permit a Bivens action for violations of Fifth Amendment due process rights in a social-security context). See also Wilkie v. Robbins, 551 U.S. 537, 541 (2007) (refusing to extend Bivens to invasion of property rights under the Fifth Amendment); Malesko, 534 U.S. at 63 (refusing to extend Bivens to alleged Eighth Amendment violations by employees of private prisons).

Instead, the recognition of a cause of action is context-specific. The Supreme Court has set out a rigorous two-step inquiry for courts to determine whether to imply a Bivens cause of action in a new context or against a new category of defendants. First, the court must determine whether a plaintiff's claims arise in a new Bivens context. "If the case is different in a meaningful way from previous Bivens cases decided by [the Supreme Court], then the context is new." Id. at 1859. The Supreme Court did not offer an "exhaustive list of differences that are meaningful enough to make a given context a new one," but it did offer examples that "might prove instructive." Id. at 1859-60. The Court held that

> [a] case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous Bivens cases did not consider.

Id. at 1860.

If the case presents a new factual context for a <u>Bivens</u> claim, then the court proceeds to the second step and asks, "whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." <u>Wilkie</u>, 551 U.S. at 550. Irrespective of whether an alternative remedy exists, a federal court must also conduct a specific analysis, "paying particular heed . . . to any special factors counselling hesitation before authorizing a new kind of federal litigation." <u>Id.</u> (internal quotation marks omitted). This second step is often referred to as the special-factors analysis. "The Court's precedents now make clear that a <u>Bivens</u> remedy will not be available if there are special factors counselling hesitation in the absence of affirmative action by Congress." <u>Ziglar</u>, 137 S. Ct. at 1857 (internal quotation marks omitted).

Although the Supreme Court "has not has not defined the phrase 'special factors counselling hesitation,'" the Court has observed that "[t]he necessary inference, though, is that the inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." <u>Id.</u> at 1857-58. Put more simply, "to be a 'special factor counselling hesitation,' a factor must cause a court to hesitate before answering that question in the affirmative." <u>Id.</u> at 1858.

Applying <u>Ziglar</u>'s first step here, plaintiff's claim clearly arises in a new context. None of the three Supreme Court cases that have allowed <u>Bivens</u> claims arose in the context of a prisoner's due-process rights. Only one of them, <u>Davis</u>, involved a due-process claim at all, and that was the case-specific circumstance of a Congressman's firing a staffer because of her gender. <u>Carlson</u> may be the closest one contextually – it involved prisoners' rights – but an Eighth Amendment violation resulting in a prisoner's death is a long way from a due-process

10

violation in which a prisoner spends the five months at the end of his custodial term in a prison rather than a halfway house. This case thus has next to nothing in common with the kinds of cases in which the Supreme Court has allowed a Bivens claim.

Under Ziglar's second step – examining alternative remedies and separately examining the "special factors" – the Court cannot recognize a Bivens action on these facts.

There are certainly alternative remedies for plaintiff: at least two of them. Deprivations of constitutional rights while in custody can generally be addressed by *habeas corpus* relief, 28 U.S.C. § 2241, mandating the alleviation of the unconstitutional condition or the release of the prisoner. In addition, the Prisoners' Litigation Rights Act, 42 U.S.C. § 1997e, requires an administrative process by which the Bureau of Prisons can itself correct any unconstitutional or, going even further, undesirable conditions of confinement.

Plaintiff is frustrated because he attempted to utilize both of these remedies (at least partially) but could not obtain the relief he sought. Plaintiff may have a valid point that § 2241 may not adequately protect constitutional rights in all circumstances: it only protects against future violations once the writ of *habeas corpus* is issued and it does not permit damages for past violations. Furthermore, when a prisoner uses § 2241 to remedy unconstitutional conditions of confinement imposed near the end of his custodial term, it may be difficult to obtain timely relief because those actions are often lengthy. Of course, if the unconstitutional condition of confinement, for example, had created a high risk of injury or death, rather than requiring a transfer from a prison to a halfway house, the higher stakes would likely have compelled an expedited disposition.

As to the administrative claim process itself, plaintiff correctly points out that his victory was pyrrhic because despite his continuing protests after he prevailed in the administrative

11

appeal, he was never returned to a halfway house. But that, again, may have been because of the difficulty of the particular relief that plaintiff was seeking. Plaintiff acknowledges that he was told he would be transferred to a halfway house as soon as a bed was available. The authorities then either rescinded that decision or could not find him a bed.[6] In either case, plaintiff did not obtain satisfaction through the administrative process even though he prevailed.

However, just because Congress has not enacted a remedial scheme that would satisfy plaintiff on the facts of his particular case does not mean that the alternative remedial scheme that it did pass is inadequate under Ziglar. Congressional inaction or limited action may be as indicative of its intent as the creation of a remedy that would satisfy a particular plaintiff.

Here, in enacting the Prisoners' Litigation Rights Act, Congress expressly determined to create no new remedy, but merely to preserve such remedies as already exist under federal and state law. See 42 U.S.C. § 1997j. That obviously includes 42 U.S.C. § 2241. The fact that Congress chose not to codify, expand, or restrict Bivens indicates that it sought to address and resolve prisoner claims through an administrative process, despite the imperfection of that (or, indeed, any) process. As the Supreme Court noted in rejecting a Bivens claim in the First Amendment context:

> The question is not what remedy the court should provide for a wrong that would otherwise go unredressed. It is whether an elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations, should be augmented by the creation of a new judicial remedy for the constitutional violation at issue. That question obviously cannot be answered simply by noting that existing remedies do not provide complete relief for the plaintiff.

---

[6] Plaintiff alleges that the determination to remand him to the MDC was Bruno's doing because plaintiff had "personal/intimate relations" with her and she was retaliating because he had used his pass to visit his fiancée. However, the documents annexed to the complaint suggest that Bruno had no involvement in plaintiff's claim once he prevailed on his administrative appeal, and the complaint does not allege otherwise.

12

Bush v. Lucas, 462 U.S. 367, 388 (1983). The overlapping administrative and judicial remedies that already exist to address plaintiff's situation here are thus adequate for purposes of determining whether to imply a Bivens remedy – even though those remedies did not work in this instance.

As to special factors, I see no compelling need for this Court to interfere in the BOP's bed assignment decisions. The discussion above assumes for the sake of argument that plaintiff suffered a constitutional violation by not being reassigned to a halfway house instead of a prison, but that is not at all clear. Even at common law, the tort of "wrongful confinement" appears to protect an inmate from unwarranted segregation from the general population – no case applies it to mandate a particular type of facility with less onerous conditions of confinement. Cf. McGowan, 825 F.3d at 126 (citing New York court cases). That is all the more reason to doubt that there is a constitutional dimension to such a claim.

I therefore hold that there is no Bivens claim against these federal defendants.

**II. CORE defendants**

In Malesko, the Supreme Court declined to extend Bivens liability to private prison companies that rendered services under a federal contract. 534 U.S. at 74. In Minneci v. Pollard, 565 U.S. 118, 131 (2012), the Court declined to recognize a Bivens action for 8th Amendment violations against the employees of a private prison contractor where state law provided a remedy for the alleged conduct. Minneci's holding was notable because a claim for cruel and unusual punishment under the 8th Amendment was one of the few Bivens claims the Supreme Court had recognized against federal employees. See Carlson v. Green, 446 U.S. 14 (1980).

Putting these cases together, most cases within the Second Circuit have declined to allow a Bivens action against the employees of federal contractors, whether or not Bivens would allow such an action if the defendants were federal employees. See Moore v. Samuel S. Stratton Veterans Admin. Hosp., No. 16-cv-475, 2016 WL 3647180, at *3 (N.D.N.Y. June 3, 2016); Shapiro v. Community First Services, Inc., No. 11-cv-4061, 2014 WL 1276479, at *6, *9 (E.D.N.Y. March 27, 2014); La Ford v. Geo Grp., Inc., No. 13-cv1978, 2013 WL 2249253, at *3 (E.D.N.Y. May 22, 2013); Brooks v. Sposato, No. 11 CV 2598, 2012 WL 6756944, at *5-*6 (E.D.N.Y. Nov. 26, 2012), adopted by, No. 11-CV-2598, 2013 WL 29964 (E.D.N.Y. Jan. 2, 2013); Feldman v. Lyons, 852 F. Supp. 2d 274, 279 (N.D.N.Y. 2012); Acosta v. Robinson, No. 12-cv-2287, 2012 WL 6569766, at *2 (E.D.N.Y. Dec. 17, 2012). See also Vega v. United States, No. C11-632, 2012 WL 5384735, at *2 (W.D. Wash. Nov. 1, 2012), vacated in part on other grounds, 2013 WL 1333978 (W.D. Wash. April 1, 2013). But see Espinoza v. Zenk, No. 10-cv-427, 2013 WL 1232208, at *7-*8 (E.D.N.Y. Mar. 27, 2013) (recognizing Bivens action for First Amendment claim against employees of private contractor).[7]

The instant case is somewhat different from these authorities because, unlike Minecci, it does not appear that New York law provides a remedy for wrongful confinement to a prison as opposed to a halfway house. See McGowan v. United States, 94 F. Supp. 3d 382, 390 (E.D.N.Y. 2015), aff'd, 825 F.3d 118 (2d Cir. 2016). But Minecci did not mandate a Bivens action

---

[7] Espinoza concluded that because New York law provided no remedy for the improper solitary confinement of an inmate, it was appropriate to extend Bivens to suits against employees of a private prison contractor. I think this was wrong in two respects. First, Minecci held that there could be no Bivens claim employees of a private contractor if state law provided a remedy to the plaintiff. But the converse does not automatically follow – even in the absence of an adequate state law remedy, there may be sound reasons under Ziglar and Malesko not to permit such claims. Second, as shown above, several New York courts have in fact found improper solitary confinement actionable under the tort of "wrongful confinement." Cf. McGowan, 825 F.3d at 126 (citing New York authority for such a claim). Espinoza rejected this as inadequate because those cases rested on the 4th Amendment rather than the 5th, but it seems to me the issue is whether state law provides an adequate remedy for the conduct alleged, regardless of which constitutional provision is alleged to have been violated.

14

whenever state law did not provide a remedy. Rather, the existence of a state remedy is a sufficient reason to preclude Bivens liability, but in the absence of a state remedy there may be equally compelling reasons to avoid further expanding Bivens.

In any event, this case is a poor candidate upon which to extend Bivens to private actors because, other than facilitate the BOP's failure to remand him to a halfway house, the CORE defendants did nothing wrong. Plaintiff has two complaints against the CORE defendants; both fail.

First, plaintiff contends that Bruno set the wheels in motion for the issuance of the detainer, which is what caused his "technical escape." But that is only half of the story. The detainer issued because plaintiff was arrested and was in police custody. Whether plaintiff was rightly or wrongly arrested was not for Bruno to decide, even if she could. I see no illegality in a halfway house reporting the arrest of one of its residents to the BOP; in fact, it is a lot easier to see impropriety in not reporting it.

Second, plaintiff contends that the disciplinary hearings were rigged because the incident reports were already filled out and his guilt predetermined. I will assume that to be true. However, even though plaintiff could not obtain an adequate remedy, the administrative process did exonerate him of the charges.[8] His loss of procedural due process, which resulted in him spending completing his sentence in a prison instead of a halfway house, is not a sufficient basis to imply a right of action under Bivens.

---

[8] The complaint is not clear, but it appears that plaintiff stood to lose "good time credit" had the Regional Director accepted the Committee's recommendation, but that because the Regional Director dismissed the technical escape, he did not lose accrued credit.

## CONCLUSION

Defendants' motions to dismiss [29] and [31] are therefore granted. The Court certifies that any appeal would not be taken in good faith and therefore *in forma pauperis* status for appeal is denied. See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
       May 11, 2018